UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                   :

TOMASA M. SANTANA,            :        **MEMORANDUM**
                                   :        **DECISION AND ORDER**
                 Plaintiff,     :

                                   :        12 Civ. 0815 (BMC)

         -against-       :

                                   :

MICHAEL J. ASTRUE,         :
COMMISSIONER OF SOCIAL SECURITY,  :

                                 :

                 Defendant.    :
-------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiff brings this action pursuant to the Social Securities Act ("SSA"), 42 U.S.C. §405(g), seeking review of the Commissioner of Social Security's ("Commissioner") denial of her claim for disability benefits under Title II of the SSA and remand of this action solely for the calculation of disability benefits or further proceedings. The parties have each filed a motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, defendant's motion is denied, plaintiff's motion is granted in part and denied in part, and the case is remanded to the ALJ for further proceedings in accordance with this decision.

## BACKGROUND

### I. Procedural Background

Plaintiff filed a Title II application for Social Security Disability benefits in 2006, alleging that she became disabled on March 5, 2002 after injuring herself at her place of employment.[1] Plaintiff's Title II application was denied based on a determination that plaintiff

---

[1] Plaintiff also filed a Title XVI claim which was initially denied on February 28, 2007, but later granted by the ALJ after a hearing held on January 15, 2010. The Title XVI claim is not at issue here.

was not disabled on or before December 31, 2005, when her insurance status expired.  A timely request for a hearing was filed.  Plaintiff appeared *pro se* with an interpreter before an Administrative Law Judge.  The ALJ issued an unfavorable decision after finding that plaintiff was not disabled within the meaning of the SSA.

Plaintiff retained council and requested review of the ALJ's decision by the Appeals Council.  On August 14, 2009, the Appeals Council issued an order remanding the case back to the ALJ for further proceedings and permitted plaintiff to produce a 2003 MRI of her knee.  On November 30, 2009, the ALJ held a second hearing and plaintiff appeared with her attorney and an interpreter.  By Decision dated January 28, 2010, the ALJ found that plaintiff was not disabled from March 5, 2002, the alleged onset date, through December 31, 2005, the date plaintiff was last insured, and denied her Title II Claim.

Plaintiff appealed the ALJ's Decision.  The Appeals Council issued a Notice of Appeals Council Action on October 27, 2011, which advised plaintiff that it intended to confirm the ALJ's decision and afforded her the opportunity to submit any new and material evidence in support of her claim.  Plaintiff submitted a letter dated November 9, 2011, including the reports of psychiatrists Drs. Robotti and Sultan.  On December 20, 2011, the Appeals Council affirmed the ALJ's decision.  On February 17, 2012, plaintiff filed a complaint seeking this Court's review of the final decision of the Commissioner.

## II.  Medical and Vocational Evidence

Plaintiff was born on December 29, 1959 in the Dominican Republic.  She immigrated to the United States in 1995 and is currently a resident alien.  She has never attended school, does not speak English, and can speak, but not write, Spanish.  She has four children, one of whom died in 2000.  Plaintiff previously worked as a nanny, a fabric cutter/clothing sorter, and as a

2

cook at a restaurant.  On March 5, 2002, while working as a cook, plaintiff injured her back after picking up a heavy box which weighed more than the usual 20-30 pounds she was required to lift at her workplace.  She went to the Emergency Room at St. Luke's-Roosevelt Hospital Center that day for treatment.  She has not worked since March 5, 2002.

On April 8, 2002, plaintiff went to the Orthopedic Clinic at St. Luke's complaining of back pain and immobility in her legs.  The doctor on call treated her with codeine and discharged her with prescriptions for Flexeril and Vicodin.  Three days later plaintiff returned to the Orthopedic Clinic at St. Luke's.  A physical examination revealed spasm, decreased range of motion in her entire lumbar spine, a herniated disk, bilateral partial loss of sensation in the upper extremities, and a compression of the lumbar nerve roots.  A doctor prescribed a pain reliever and physical therapy.  After an additional visit where plaintiff's motor testing revealed full strength throughout, the physician at the Orthopedic Clinic directed plaintiff to take non-steroidal anti-inflammatories and to start physical therapy.  Plaintiff returned to the clinic in late May 2002 where a doctor advised her that she could return to work as tolerated, but she should avoid heavy lifting.  She could ambulate within normal limits and could toe heel walk with some difficulty.

Two to three months after her work injury, plaintiff began experiencing strong pain in her right knee.  Due to her lower back and knee pain, plaintiff could not sit for more than one to two hours, she needed to stand up or lie down for three hour intervals throughout the day, and had difficulty sleeping.  In September 2002, plaintiff visited the Orthopedic Clinic once again.  A physical exam revealed that plaintiff had full strength but had a diffuse annular bulge at her L5/S1 disk level without stenosis and mild degenerative joint disease.  Again, the doctor on call advised plaintiff to attend physical therapy and to continue Celebrex.

3

On September 18, 2002, plaintiff began treatment with Dr. Andrew Brown at Downtown Physical Medicine and Rehabilitation for her lower back pain. Dr. Brown's report noted that her mobility to get on and off the exam table was moderately to maximally impaired and she was able to dress and undress slowly and with pain. Additionally, Dr. Brown noted that plaintiff complained of lower back pain radiating to plaintiff's feet with numbness, as well as problems falling asleep and staying asleep due to the pain. Dr. Brown's diagnosis was traumatic lumbosacral pain syndrome with radiculitis. His notes for every single visit from November 27, 2002 through July 30, 2004 indicate that plaintiff was "totally disabled." Dr. Brown prescribed different pain medications throughout this time to help ease plaintiff's back pain.

On October 6, 2003, plaintiff went to St. Luke's ER complaining of severe abdominal pain. A doctor determined she was suffering from gallstones. Six months later, plaintiff arrived at William F. Ryan Community Health Center ("Ryan Center") complaining of upper abdominal pain and informed the doctor that she was scheduled for gallbladder surgery. Four months later, plaintiff arrived at the Ryan Center complaining of shortness of breath (dyspnea) after walking four to five blocks.

On August 27, 2004, plaintiff was evaluated by Dr. Liana Dao at the Ryan Center who concluded that plaintiff's pulmonary function suggested obstruction and plaintiff's stress echocardiogram was abnormal. Although her LVEF[2] was normal, there was trivial tricuspid regurgitation.[3] Because of plaintiff's chest pains, she underwent outpatient cardiac catheterization on October 5, 2004. One month later, plaintiff presented again to St. Luke's ER

---

[2] Left ventricular ejection fraction is the measurement of how much blood is being pumped out of the left ventricle with each contraction.

[3] Tricuspid regurgitation is a disorder in which the heart's tricuspid valve does not close properly, causing blood to flow backward into the right upper heart chamber when the right lower heat chamber contracts.

with complaints of chest pain and shortness of breath.  Her blood pressure was normal, but she was admitted to the medical floor for evaluation.  Plaintiff's blood pressure steadily decreased, and she was discharged two days later.

Dr. Dao continued to examine plaintiff periodically through March 20, 2005, during which time Dr. Dao diagnosed plaintiff with stable hypertension, chronic back pain, and angina. Dr. Dao noted in several reports that plaintiff suffered from chronic low back pain and that plaintiff complained of right knee pain, dizziness and headaches.  In a medical report dated March 30, 2006, Dr. Dao noted that plaintiff was depressed with anxiety and had extreme sleep decline to 1-2 hours per night.

Plaintiff's knee pain increased in early December 2005 and she returned to St. Luke's Orthopedic Clinic.  Both knees exhibited full range of motion with minimal crepitus in the right knee, and mild medial and lateral joint tenderness.  A 2006 MRI taken at St. Luke's Hospital showed a horizontal tear to the medial meniscus, a probable tear of the medial most aspect of the anterior horn of the lateral meniscus, and degenerative changes of the articular cartilage overlying the patella.  A 2008 MRI of plaintiff's knee showed no evidence of tears of the medial or lateral menisci.[4]

Plaintiff began treatment with Dr. Daniel Boccardo, of MB Medical Associates, in May 2006 and continued through May 2010.  Plaintiff initially saw Dr. Boccardo regarding her chest pain and depression.  EKG and cardiac stress tests were both within normal limits.  On June 3, 2006, Dr. Boccardo noted that plaintiff's diagnoses were controlled hypertension, coleithiasis (gallstones), sciatica with a herniated disk, depression, and coronary artery disease.  Two months later, plaintiff had successful gallbladder surgery.

---

[4] Plaintiff testified that she had an MRI taken of her knee in 2003 but she was unable to find her copy of it, and that the radiology department did not have a record of the MRI.

On November 2, 2006, Dr. Boccardo completed a functional capacity form for plaintiff. He assessed that plaintiff's ability to lift and carry was limited and checked off "frequently (up to 2/3 of a work day)", but did not indicate how many pounds she could lift and carry.  He also noted that her ability to stand and/or walk was limited to less than two hours per day, and that her ability to sit was limited and checked "up to six hours per day."  He noted that her ability to push and/or pull was limited.  Additionally, he noted that plaintiff had constant low back pain, suffered from a permanent disability due to depression, and was unable to walk properly.  Dr. Boccardo's assessments regarding plaintiff's depression are described in greater detail below.

## III. Depression Evidence

Plaintiff testified at the hearing that her daughter died in 2000, and her husband died a short time later, also in 2000.  She testified that after these two deaths, she began having depression related issues that affected her ability to work.  Plaintiff also testified that she began having trouble sleeping, and that for five nights of the week she only slept one to two hours per night.  She also testified that she cries often and hears voices.  In support of her depression claim, plaintiff submitted the reports and records of Dr. Boccardo and two psychiatrists.  Treatment records of Dr. Boccardo from August 21, 2006 through August 19, 2009 indicate a diagnosis for depression and depressive disorder.

In June 2006, plaintiff saw Dr. Boccardo complaining that she felt very depressed.  Dr. Boccardo checked "Negative" for Psychiatric under Review of Systems on plaintiff's medical form, yet proceeded to diagnose her with "depressive disorder (311)" and ordered a psychiatric consult.  Two months later, Dr. Boccardo again checked "Negative" for Psychiatric Review of Systems, and diagnosed plaintiff with depressive disorder and ordered a psychiatric consult.  In June 2007, Dr. Boccardo made the same findings, but noted that plaintiff "did not see

6

psychiatrist due to lack of coverage."  Plaintiff was also seen in mid-2006 by Dr. Melamedoff, a doctor in Dr. Boccardo's office, who diagnosed her with psychogenic paranoid psychosis.

In his 2007 functional capacity report, Dr. Boccardo's checked "normal" for plaintiff's ability to understand, remember, and carryout instructions, as well as her ability to respond appropriately to co-workers and to supervision.  However, he checked "abnormal" in the areas of sustaining adequate attendance and meeting quality standards and production norms.  In the space provided for an explanation, Dr. Boccardo noted "Depressive Disorder."

In January 2009, plaintiff began attending the Corona Elmhurst Guidance Center, because her insurance began to cover psychiatric care.  She received psychotherapy sessions once a week and psychiatric sessions once a month.  According to records submitted by the Corona Clinic, from January 12, 2009 until October 20, 2009, plaintiff attended 33 sessions at the Corona Clinic with psychiatrists Drs. Sady Sultan and Flavia Robotti, or social worker Jennifer Osorio.

On June 22, 2009, after plaintiff had participated in 20 therapy or psychiatry sessions at the Corona Clinic, Dr. Robotti completed a psychiatric report in which she diagnosed plaintiff with major depressive disorder with psychotic features.  Dr. Robotti opined that plaintiff's illness commenced in July 2000, soon after the deaths of plaintiff's husband and daughter, and that the depression worsened when plaintiff was injured at work.  In her report, the doctor noted that plaintiff had heard auditory hallucinations and paranoid ideations since July 2000 and that plaintiff's "GAF" score was 55 when her illness began.[5]

---

[5] Plaintiff states that the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Revised (2000) defines Global Assessment of Functioning ("GAF") as "the clinician's judgment of the individual's overall level of functioning" and that a GAF score of 55 is defined as "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)."

Plaintiff told Dr. Robotti that she lost communication with family and friends when she became depressed, and that she had difficulty with personal hygiene and maintaining her home. Finally, Dr. Robotti indicated that plaintiff had marked limitations in performing the activities of daily living, social functioning, and in concentration, persistence, and pace. Dr. Robotti further found that plaintiff also had extreme limitations in: response to ordinary work pressure; ability to understand, remember, and carry out instructions; responding appropriately to co-workers and supervisors; meeting production, quality, and attendance standards; performing routine, repetitive, simple jobs in the normal work setting; doing complex work; doing varied, changing work; and performing work in other than a sheltered setting.

Dr. Robotti further found that plaintiff was totally disabled from all work as a result of the psychiatric illness which commenced in 2000, became a severe impairment in 2002, and continues to prevent plaintiff from working. Dr. Robotti noted that plaintiff had slow speech appropriate for depressed mood, a slow and dull activity level, and was tearful.

In 2010, Dr. Robotti completed a mental status examination form for Catholic Charities. She noted that plaintiff's attitude was cooperative, but her mood was irritable, depressed, and anxious. Plaintiff's affect was appropriate, full, and congruent and her psychomotor activity was normal. Plaintiff still reported hallucinations, but her thought process was logical and plaintiff was alert. Plaintiff's memory, however, was impaired. Plaintiff's insight was fair and her judgment and impulse control were unimpaired. Dr. Robotti again diagnosed plaintiff with major depressive disorder with psychotic features, and noted plaintiff had a GAF of 55.

Plaintiff's other psychiatrist, Dr. Sultan, completed a psychiatric report in 2011. She also opined that plaintiff's illness began in July 2000, after the deaths of her husband and daughter, and noted the same symptoms that Dr. Robotti reported. Dr. Sultan also diagnosed plaintiff with

8

major depressive disorder with psychotic features and concluded that plaintiff was disabled from all work as of March 2002.  Dr. Sultan opined that plaintiff's medical diagnosis met Listing 12.04 for Affective disorders.  Among other things, Dr. Sultan found that plaintiff was severely impaired in the areas of activities of daily living, social functioning, concentration, persistence and pace and would experience deterioration or decompensation in work settings.  Additionally, Dr. Sultan found plaintiff to have impaired behavior, speech patterns, thought processes, and a depressed, sad, and tearful affect.  Finally, Dr. Sultan noted that plaintiff had extreme impairments in all areas of functioning associated with work settings.

## IV.  The ALJ's Decision

By Decision dated January 28, 2010, the ALJ denied plaintiff's application for disability benefits after finding that plaintiff's impairments were not severe.  The ALJ determined that, from March 5, 2002, the alleged onset date, through December 31, 2005, the date of last insured, plaintiff had cardiac, back, and cholelithiasis (gallstone) impairments.  However, he found that the impairments, or a combination of the impairments, did not significantly limit plaintiff's ability to perform basic work-related activities for 12 consecutive months and that therefore plaintiff did not have a severe impairment or combination of impairments.

The ALJ noted that even though Dr. Brown diagnosed plaintiff with lower back pain, lumbar facet syndrome, and traumatic lumbosacral pain syndrome with radiculitis and determined that plaintiff was "disabled," Dr. Brown also concluded that plaintiff's back strength was normal.  The ALJ therefore assigned little weight to the opinion of Dr. Brown.  The ALJ also noted that plaintiff underwent left heart catheterization, left ventriculogram, and coronary angiogram in 2004 and her blood pressure stabilized before her date of last insured.  The ALJ noted that plaintiff had been treated for bilateral knee pain, but he assigned little weight to these

9

records because they also showed that plaintiff's knees had a full range of motion and only minimal crepitus.

The ALJ also took into account the SSA Physical Residual Functional Capacity Assessment Form, signed by Dr. M. Cox, a Disability Determination Services ("DDS") examiner, on February 27, 2007.  Dr. Cox opined that plaintiff could carry ten to twenty pounds occasionally, sit stand or walk for six hours in an eight hour work day, and that her push and pull capacity was unlimited.  The form also notes that plaintiff had limitations in climbing, balancing, kneeling, stooping and crouching.  The ALJ emphasized that Dr. Cox's opinions were all dated subsequent to the date last insured and that they therefore had no value in determining type or severity of plaintiff's impairments for the relevant time period.

Additionally, the ALJ referenced the opinion of Dr. Gowd, another DDS consultant. However, he observed that the only documents in the record from Dr. Gowd were Electronic Requests for Medical Advice and Medical Evidence.  The ALJ noted that these documents were "negative" for any opinion about the severity of plaintiff's impairments, and that these documents were dated subsequent to the date last insured.

The ALJ found that plaintiff's medical impairments could reasonably be expected to cause the symptoms she alleged, but that the intensity, persistence, and limiting effects of the symptoms were not credible because they were inconsistent with the finding that she had a severe impairment or combination of impairments before December 31, 2005.

The ALJ also reviewed a psychiatric report by Dr. Robotti, dated June 22, 2009 which includes a diagnosis of depressive disorder and an onset date of July 2000.  The ALJ determined, however, that despite her status as a treating physician, the length of the treatment relationship

and a lack of evidence to corroborate her opinion made the opinion conjecture.  Dr. Robotti's opinion was therefore given little to no weight.

Finally, the ALJ noted that the record contained various examination reports and treatment records of various doctors from 2006 to 2009 but that these documents were all dated after the date last insured and therefore had "no value" in determining type and severity of plaintiff's impairments from the alleged onset date through to the date last insured. Consequently, the ALJ gave no weight to the opinions rendered in these records.

## V.  The Appeals Council Decision

By Decision dated December 20, 2011, the Appeals Council adopted the ALJ's statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings and Acquiescence Rulings, the issues in the case, and the evidentiary facts, as applicable.  The Appeals Council also adopted the ALJ's findings or conclusions regarding whether plaintiff was disabled.  However, the Appeals Council disagreed with the ALJ's finding that, for the relevant period, plaintiff did not have a severe impairment or combination of impairments.  Specifically, the Appeals Council found that plaintiff had the following severe impairments during the relevant period:  cardiac impairment, back impairment, and cholelithiasis (gallstones), but determined that plaintiff's severe impairments did not meet the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The Appeals Council further found that plaintiff had the residual functional capacity to perform "the full range of light work" during the relevant period.  The Appeals Council referenced the opinion of Dr. Gowd, medical consultant for the State Agency, who determined that plaintiff had the capacity for lifting 20 pounds occasionally, and stooping and crouching

11

occasionally.  Moreover, the Appeals Council found that plaintiff had written in her Work
History Report that she worked as a clothing sorter[6] from June 1997 to November 1998, a job
that required walking or standing for eight hours, and handling, kneeling, crouching and
crawling.  She had also mentioned that she frequently lifted ten pounds and that the heaviest
weight she carried during that employment was twenty pounds.  The Appeals Council concluded
that for the period March 5, 2002 through December 31, 2005, plaintiff was able to perform her
past relevant work as a clothing sorter, as generally performed.

The Appeals Council found that medical evidence from 2002 indicated that plaintiff was
treated for lower back pain and that degenerative facet hypertrophy was noted at the L4-L5 level
and a 2002 MRI of the lumbar spine showed likely hemangioma in the L3 vertebral body.  It also
mentioned that a follow-up exam report dated February 5, 2004, from Dr. Brown, indicated
traumatic lumbosacral pain syndrome with radiculitis and opined that plaintiff was totally
disabled.  However, finding that this examination of plaintiff revealed "normal strength," and
noting that plaintiff stated that a Lidoderm patch provided her with symptomatic relief, the
Appeals Council determined that Dr. Brown's opinion of disability was not supported by the
evidence of record and therefore gave it little weight.

The Appeals Council also found that Dr. Boccardo, in a medical report dated November
2, 2006, treated plaintiff for lumbalgia, secondary to full herniated disc at L5-S1, hypertension,
coronary artery disease, and depressive disorder, and that Dr. Boccardo noted plaintiff was
unable to walk upstairs and had chest pain with exertion.

The Appeals Council also addressed the psychiatric evidence submitted by plaintiff in
response to the Notice of the Appeals Council Action.  Evaluating the evidence submitted by
plaintiff's psychiatrists, the Appeals Council noted that three doctors had diagnosed plaintiff

---

[6] The parties appear to use the terms "fabric cutter" and "clothing sorter" interchangeably.

12

with depressive disorder.  The Appeals Council noted that treatment records from Dr. Boccardo dated August 21, 2006 through August 19, 2009 indicated a diagnosis of depression and depressive disorder.  The Appeals Council further observed that the records also showed that plaintiff was prescribed psychotropic medications and that Dr. Boccardo opined that plaintiff was normal in understanding, carrying out and remembering instructions, and in responding appropriately to co-workers and supervision, but abnormal in meeting quality standards and production norms or sustaining adequate attendance.  The Appeals Council found that this last opinion was not supported by the evidence of record, that the record indicated that plaintiff did not see a psychiatrist due to lack of insurance, and that plaintiff's psychiatric exams were negative.  Based on these findings, the Appeals Council determined that the medical evidence in the record did not support the limitations assessed by Dr. Boccardo.

Noting that plaintiff submitted new evidence after the Notice of the Appeals Council Action was issued, the Appeals Council considered a psychiatric report dated March 18, 2011 from Dr. Sultan, a mental status exam dated April 26, 2010 from Dr. Robotti, and a psychiatric report dated June 22, 2009 also by Dr. Robotti.  Both doctors found that plaintiff was irritable, anxious, and depressed and that since 2002, plaintiff suffered from an affective disorder that met Listing 12.04.

Finding that the opinions of Drs. Sultan and Robotti were based on the subjective reports of plaintiff and emphasizing the fact that neither doctor examined plaintiff until January 2009, well after plaintiff's date last insured of December 31, 2005, the Appeals Council concluded that the opinions of disability from Drs. Sultan and Robotti were not supported by the evidence of record.

**DISCUSSION**

I.       **Standard of Review**

The Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court does not make a de novo determination, but undertakes a "plenary review" of the record to determine whether there is substantial evidence to support the denial of benefits. Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996). When reviewing a final decision of the Commissioner, the Court must determine "whether the correct legal standards were applied and whether substantial evidence supports the decision." Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002). Substantial evidence is "more than a mere scintilla" which "a reasonable mind might accept as adequate to support a conclusion." Canales v. Commissioner of Social Security, 698 F. Supp. 2d 335, 341 (E.D.N.Y. 2010) (citing Richardson v. Perales, 402 U.S. 389, 389, 91 S. Ct. 1420 (1971)).

"Where an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) (quoting Wiggins v. Schweiker, 679 F.2d 1387, 1389 n. 3 (11th Cir. 1982) (ALJ erred by failing to mention and give proper weight to opinion of treating physician and by applying the incorrect standard for evaluating subjective complaints of pain). Thus, the Court reviews de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles. See Townley, 748 F.2d at 112.

14

## II.    Standard for Entitlement to Disability Benefits

A person is disabled when she displays an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §423(d)(1)(A).  Furthermore, an individual will be determined to be under a disability "only if h[er] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(1)(B).

The Commissioner applies a five-part test to determine whether an individual is disabled. See 20 C.F.R. §416.920.  At the first step, the Commissioner determines whether an individual is currently engaged in substantial gainful activity.  If so, the claim is denied.  If not, at the second step, the Commissioner determines whether medical evidence indicates that the individual has a "severe" impairment.   If an individual's impairments, or combination of impairments, are severe at the date of last insured, the Commissioner will continue to the third step to determine whether the severe impairments meet the listings required for automatic entitlement to benefits.    If so, she will be found disabled.  If an individual is not entitled to benefits under step three, the Commissioner moves on to step four and considers the individual's residual functional capacity to determine if she could perform any past relevant work.   If the individual cannot perform her past relevant work, at the final step, the burden shifts to the Commission who must determine whether she is capable of performing other work which exists in the national economy, given her age, education, work experience and residual functional capacity.   If an individual cannot make an adjustment to other work, she will be found disabled.

15

### III.     The Treating Physician Rule

A treating physician is a medical professional who can "provide a detailed, longitudinal picture" of medical impairments, as opposed to providing an opinion obtained from "the objective medical findings alone or from reports of individual examinations, such as consultative examinations."  20 C.F.R. § 404.1527(c)(2).  The opinion of a treating physician "on the nature or severity of a claimant's impairments is binding" on the Commissioner as long as the opinion is "well supported by medical findings and not inconsistent with other substantial evidence," as set forth in 20 C.F.R. § 404.1527(c)(2).  See Selian v. Astrue, No. 12-871, 2013 WL 627702 (2d Cir. Feb. 21, 2013); Wagner v. Sec'y of Health and Human Services, 906 F.2d 856, 861 (2d Cir. 1990) (stating that under the "treating physician rule," a treating physician's opinion is entitled to some extra weight because the treating physician is usually more familiar with a claimant's medical condition than are other physicians").

 In order to override the opinion of the treating physician, the Second Circuit has held that the Commissioner "must explicitly consider, *inter alia:* (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."  Selian v. Astrue, No. 12-871, 2013 WL 627702, at *7 (2d Cir. Feb. 21, 2013) (citing Burgess v. Astrue, 537 F.3d 117, 128-29 (2d Cir. 2008)).  When the Commissioner does not give the treating physician's opinion controlling weight, it must "always give good reasons" for the weight it applies to the treating source's opinion.  20 C.F.R. § 404.1527(c)(2).

Treating source opinions on issues reserved for determination by the Commissioner, such as whether plaintiff meets the definition of "disability" under the Act, are not entitled to any

significant weight. See 20 C.F.R. §§ 404.1527(e), 416.927(e); see also, Elhanafi v. Barnhart, No. 06 Civ. 411, 2007 WL 602391, at *6 (E.D.N.Y. Feb. 21, 2007) (finding that although treating physician's conclusions as to plaintiff's "total disability" were exempt from the "controlling weight of the treating-physician rule, the ALJ should have nonetheless expressly considered them in his decision.").

## IV.    Errors of Law in Final Decision of the Commissioner

The Court has identified several problems with the final decision of the Commissioner. First, the Court is unable to conclude that there is substantial evidence in support of the Appeals Council's conclusions that for the period March 5, 2002 through December 31, 2005, plaintiff had the residual functional capacity to perform the full range of light work, and that since plaintiff's past relevant work as a clothing sorter was at the light exertional level, she could return to this job as generally performed.  Second, the Court finds that it was error for the Appeals Council to place little to no weight on the opinions of plaintiff's treating psychiatrists Drs. Robotti and Sultan and treating physician Dr. Boccardo that plaintiff suffered from depression during the relevant time period.

### Dr. Brown's Opinion

The Court finds that the Appeals Council failed to apply properly the treating physician rule in giving little weight to the opinion of Dr. Brown that plaintiff was totally disabled.  The record demonstrates that Dr. Brown treated plaintiff from 2002 to 2005 and that he diagnosed her with traumatic lumbosacral pain syndrome with radiculitis.  He noted in his reports that another doctor recommended epidural steroid injections and that he planned to renew Robaxin, the Lidoderm patch and Vioxx and that plaintiff was "totally disabled" with regard to her working capacity.  The Appeals Council concluded, however, that an examination by Dr. Brown showed

17

that plaintiff's back strength was "normal," and that the Lidoderm patch provided her with symptomatic relief.  Based on these two observations, the Appeals Council found that Dr. Brown's opinion of disability was not supported by the evidence of record.

The Court has reviewed Dr. Brown's follow-up examination report dated February 5, 2004.  Nowhere on this report does Dr. Brown state that an examination of plaintiff's back revealed normal strength.  The Appeals Council seems to have relied on the ALJ's Decision which found that Dr. Brown's treatment records from November 2002 to March 2005 reflected that an examination of plaintiff's back revealed normal strength and an examination of her vascular system revealed normal findings.  The ALJ referred to Exhibits 14F and 16F which contain Dr. Brown's treatment records.  The Court reviewed both exhibits and, again, nowhere in these records does Dr. Brown state that plaintiff's back revealed normal strength.

It is possible that the ALJ or the Appeals Council derived this information about plaintiff's normal back strength from another report.  In any event, considering that Dr. Brown's opinion is not contradicted by the medical evidence of record, and in light of the fact that he was plaintiff's treating physicians during the relevant time period, it appears that Dr. Brown's opinion was not afforded the appropriate weight by the Appeals Council.

<u>Dr. Gowd's Opinion</u>

The Court finds that it was further error for the Appeals Council to give greater weight to the December 12, 2006 opinion of Dr. Gowd than to the opinions of Dr. Boccardo and other treating physicians who opined about plaintiff's residual functional capacity.  It appears that on December 12, 2006, Dr. Gowd, a medical consultant for the State Agency, opined that plaintiff could stand or walk for six hours, occasionally lift 20 pounds, stoop and crouch occasionally, and that there was no impact to her ability to kneel and crawl.

The ALJ noted that on remand, the Appeals Council had instructed him to evaluate the medical opinion rendered by Dr. Gowd, but that the only documents of record from Dr. Gowd are an Electronic Request for Medical Advice and an Electronic Request for Medical Evidence. The ALJ further noted that these documents are negative for any opinion about the severity of plaintiff's impairments and that they were dated subsequent to the date last insured.  Without offering any explanation as to why it was giving weight to Dr. Gowd's opinion in reversal of the ALJ's determination of this issue, and without describing the context of Dr. Gowd's opinion, the Appeals Council gave tremendous weight to Dr. Gowd's opinion.  In fact, the Appeals Council's conclusion that plaintiff could return to her past work as a clothing sorter is based largely on Dr. Gowd's opinion that she could withstand the physical demands of her prior job:  standing for eight hours and handling, kneeling, crouching and crawling for eight hours.  However, the Appeals Council offers no facts regarding how many times Dr. Gowd examined plaintiff, if at all, nor what records she reviewed.

The Appeals Council also offered no opinion as to why it was discrediting the limitations assessment of Dr. Boccardo; it merely concluded that the medical evidence of record did not support the limitations assessed by Dr. Boccardo, who, as plaintiff's treating physician, noted, among other things, that plaintiff was unable to walk properly and that her ability to stand and/or walk was limited to less than two hours per day.

Plaintiff additionally argues that the Appeals Council also erred in not considering a 2006 MRI of plaintiff's knee.  The Court agrees that the Appeals Council should have reviewed and considered the 2006 MRI of plaintiff's knee as well as other medical evidence regarding plaintiff's knee, since her prior work required eight hours of kneeling, among other activities.

Evidence of Plaintiff's Depression

Finally, the Court finds that the Appeals Council failed to apply properly the treating physician rule in giving little to no weight to the opinions of psychiatrists Drs. Sultan and Robotti and to the assessments of Dr. Boccardo regarding plaintiff's depression.

The Appeals Council identified two problems with the opinions of disability by Drs. Sultan and Robotti. First, the Appeals Council found that their opinions were not supported by the evidence of the record. Second, it found that the opinions of these two doctors appeared to be based on the "subjective reports" of plaintiff due to the fact that neither Dr. Sultan nor Dr. Robotti examined plaintiff until January 2009, "well after the expiration of [her] date last insured on December 31, 2005."

The evidence of record does, in fact, support the opinions of Drs. Sultan and Drs. Robotti. Plaintiff testified that she became depressed when both her husband and daughter died in 2000 and that she had difficulty sleeping. Dr. Dao noted that plaintiff was depressed with anxiety with extreme sleep decline from 1-2 hours per night in March 2006. Dr. Boccardo, plaintiff's treating physician of more than five years, diagnosed plaintiff with depression and depressive disorder in May 2006 and referred her for a psychiatric consult; he continued to note that she was depressed through May 2010. Furthermore, Dr. Boccardo also assessed plaintiff as abnormal in meeting quality standards and production norms and sustaining adequate attendance.

The Appeals Council found that because plaintiff's psychiatric exams were "negative," the evidence did not support the limitations assessed by Dr. Boccardo. These notes, which the Appeals Council held to be inconsistent with the psychiatrists' medical opinion, do not constitute evidence sufficient to minimize the weight given to a treating physician. In referencing plaintiff's psychiatric exams, the Appeals Council referred to Dr. Boccardo's examination sheets,

which contain a section for "ROS", an acronym for "Review of Systems."[7]  In this section of his notes, he marked that plaintiff's psychiatric system was "negative" on all of her visits.  On the same examination sheets, however, Dr. Boccardo recorded a diagnosis of "Depressive Disorder" and referred plaintiff for a psychiatric consult.  The Appeals Council points to this discrepancy as evidence that undermines the opinions of Drs. Robotti and Sultan.

A careful examination of Dr. Boccardo's notes, however, reveals that plaintiff's cardiovascular system is checked "negative" for every visit even when plaintiff's stated reason for the appointment was heart palpitations or chest pain.  The Appeals Council did not consider the negative cardiovascular system review to be contradictory evidence when it found that plaintiff had a severe cardiac impairment during the relevant period.  Furthermore, despite the fact that plaintiff had multiple health issues, Dr. Boccardo never checked "positive" under the ROS for any of plaintiff's systems.

This raises a question, not addressed by the ALJ or the Commissioner, as to what function an ROS serves in a medical examination generally, and what function it served here.  In some situations, the ROS is nothing more than a yes or no answer to the health care provider's checklist questions at the outset of the interview.  It is, in effect, self-reporting without much if any evaluation by the health care provider.  As more in-depth questions are asked during the interview, however, the health care provider may be better able to evaluate the patient's condition, and may arrive at a diagnosis that directly contradicts the patient's answers to the ROS questions.  Given that the ROS may be of limited probative value, the Court questions the weight placed upon the ROS by the Appeals Council and directs the ALJ, on remand, to reconsider the appropriate weight to give the ROS.

---

[7] Section 2:18 of the Attorneys Medical Deskbook titled, "History and physical examination records," defines the Review of Systems as an inquiry into the status of each organ system.  See Dan J. Tennenhouse, Attorneys Medical Deskbook § 2:18 (4th ed. 2012).

Even if the ROS conflicted with Dr. Boccardo's own assessments, courts in this Circuit have held that the Commissioner "may not reject a treating physician's disability opinion based 'solely' on internal conflicts in that physician's clinical findings." Pena v. Comm'r of Soc. Sec., 08-CV-3304, 2010 WL 4340449, 4 (E.D.N.Y. Oct. 22, 2010) (citing Carvey v. Astrue, No. 09–cv–4438, 2010 WL 2264932, at *2 (2d Cir. June 7, 2010)); see also Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998) (The ALJ erred in rejecting the opinions of physicians solely on the basis that the opinions allegedly conflicted with the physicians' own clinical findings). However, it appears that this is exactly what the Appeals Council did in this case.

The Appeals Council also failed to give sufficient weight to the retrospective diagnoses of depression by plaintiff's treating psychiatrists, Drs. Robotti and Sultan, because their opinions were "based on the subjective reports" of plaintiff and because neither psychiatrist examined plaintiff until January 2009, "well after the expiration of [plaintiff's] last date insured on December 31, 2005."

There is no question that Drs. Robotti and Sultan were plaintiff's treating psychiatrists. The record demonstrates that at the time Dr. Robotti issued her first report in 2009, plaintiff had attended 20 appointments over six months at the Corona Elmhurst Guidance Center. Plaintiff attended psychotherapy once per week with Jennifer Osorio, and psychiatric sessions once per month with Dr. Sultan or Robotti. Dr. Robotti issued her second report citing the same retrospective diagnosis of depressive disorder, in April of 2010, at which point plaintiff had been under her care for a year and a half. Dr. Sultan issued her first report, citing the same diagnoses, in March 2011, over two years after plaintiff originally became her patient.

"A treating physician's retrospective opinion may be probative when based upon clinically acceptable diagnostic techniques and not contradicted by the other medical evidence."

Perez v. Chater, 77 F.3d 41, 48 (2d Cir. 1996) (citation omitted).  In Agnese v. Chater, 934 F.Supp. 59 (E.D.N.Y. 1996), the plaintiff offered only the retrospective diagnosis of her treating physician that she suffered from a psychological disability fifteen years before the date he first treated her.  She provided no contemporaneous medical evidence period and the only evidence she presented regarding her symptoms was her own testimony.  The District Court reversed the Commissioner's determination that plaintiff was not disabled, relying on SSR 83-20 and the weight normally accorded a treating physician's opinion, finding that the physician's conclusion was "medically acceptable" and consistent with lay testimony from plaintiff's husband and neighbor.  Concluding that the Commissioner had not offered any evidence to contradict her treating physician's diagnosis, the Court held that plaintiff was disabled as a matter of law prior to her last date insured.  Other cases, such as Arroyo v. Callahan, 973 F.Supp. 397 (S.D.N.Y. 1997), and Martinez v. Barnhart, 262 F. Supp.2d 40 (W.D.N.Y. 2003), provide further confirmation that there is nothing improper about the diagnostic method of using the patient's subjective opinion of her depression in order to identify the onset of the plaintiff's mental disability.

It is axiomatic that a treating psychiatrist must consider a patient's subjective complaints in order to diagnose a mental disorder.  In fact, whether dealing with mental health or not, consideration of a "patient's report of complaints, or history, [a]s an essential diagnostic tool," is a medically acceptable clinical and laboratory diagnostic technique.  Hernandez v. Astrue, 814 F.Supp.2d 168, 182 (E.D.N.Y. 2011) (citing Green-Younger v. Barnhart, 335 F.3d 99, 108 (2d Cir. 2003).  This is especially true for diagnoses of mental disorders because unlike orthopedists, for example, who can formulate medical opinions based upon objective findings derived from objective clinical tests, scans or x-rays, a psychiatrist typically treats the patient's subjective

23

symptoms or complaints about those symptoms.  Indeed, it is not at all clear to what "objective" tests the Appeals Council would have had the treating physicians perform to confirm their diagnosis.  At the very least, the Appeals Council needed to explain why it was not a medically acceptable clinical diagnostic technique, with regard to psychiatric conditions such as depression, for plaintiff's treating psychiatrists to rely upon her self-reported symptoms or subjective complaints.  See Rivas v. Barnhart, No. 01 Civ. 3672, 2005 WL 183139 (S.D.N.Y. Jan. 27, 2005).

The Court therefore concludes that the Appeals Council failed to apply the treating physician rule to the diagnoses of depression by treating psychiatrists Drs. Robotti and Sultan.

**V.     Remedy**

Where the existing record contains persuasive proof of disability and a remand for further evidentiary proceedings would serve no further purpose, a remand for calculation of benefits is appropriate.  Parker v. Harris, 626 F.2d 225 (2d Cir. 1980); see also Rivera v. Sullivan, 923 F.2d 964 (2d Cir. 1991) (reversal and the immediate award of benefits appropriate in light of retrospective diagnosis of treating physician that plaintiff was disabled, the Commissioner's failure to present any contradictory evidence, and the length of time the litigation had already consumed); Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987) (remand for further administrative proceedings is unnecessary where application of correct legal standard could lead to only one conclusion).

The Court concludes that it was error for the Appeals Council to give Dr. Brown's opinion little weight and Dr. Gowd's opinion greater weight, and that it was also error for the Appeals Council to give little to no weight to the opinions of treating physician Dr. Boccardo and treating psychiatrists Drs. Robotti and Sultan.  The correct application of the treating

physician rule would show that plaintiff does not have the residual functional capacity to return to her past relevant work, and that plaintiff is almost certainly not able to do any other work considering her residual functional capacity, age, education, and work experience.  Plaintiff testified, and the Commissioner has not challenged, that she has never attended school, she cannot speak English, and that in the past, she has only worked as a nanny, clothing sorter, and cook at a restaurant, all jobs which require certain physical activities which the record shows plaintiff cannot handle.  However, under the last step of the sequential evaluation process, the burden shifts to the Commissioner to provide evidence that demonstrates that other work exists in significant numbers in the national economy that the plaintiff can do, given her residual functional capacity, age, education, and work experience.

Therefore, the Court remands this case for further evidentiary proceedings to reassess plaintiff's residual functional capacity and to determine whether there is other work that plaintiff can do.  In doing so, the ALJ must consider the evidence that the Appeals Council erroneously rejected, as discussed in this Court's decision.  Finally, the Court notes that plaintiff has requested that if the Court deems it appropriate to remand the matter for further proceedings, that a psychiatrist be designated to testify at any further hearing on the issue of the onset date of plaintiff's psychiatric disability and that the matter be heard by a different ALJ.  The Court grants plaintiff's request to appoint a psychiatrist to testify regarding the onset of plaintiff's depression.  However, the Court denies plaintiff's request for the matter to be heard by a different ALJ.  Plaintiff has not identified any basis for requiring a different ALJ.

## <u>CONCLUSION</u>

For the foregoing reasons, defendant's motion for judgment on the pleadings [13] is denied and plaintiff's motion for judgment on the pleadings [11] is granted in part and denied in part.  The final decision of the Commissioner is reversed in part, and the case is remanded for further development of the record.

**SO ORDERED**.

_____<br>U.S.D.J.

Dated: Brooklyn, New York
       March 25, 2013